NICOLE FORD     )
         )
   Plaintiff,   )
         )
v.        )   Case No. 3:08-cv-635
         )
         )   JUDGE HAYNES
CHAD YOUTH ENHANCEMENT )
CENTER, Et. Al.    )
         )
   Defendant.   )

## MEMORANDUM

Plaintiff, Nicole Ford, filed this action for race discrimination, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq,, against her former employer Chad Youth Enhancement Center ("CHAD"), Universal Health Services, Inc., UPS of Delaware, Inc., Oak Plains Academy, Inc. (collectively referred to as "Defendants"). Plaintiff's specific claim is that as a Caucasian female, she was subjected to a racially hostile working environment and harassed by two African American employees of CHAD leading to her constructive discharge. Plaintiff alleges that her constructive discharge was caused "by being given the hardest assignments, not receiving the assistance other employees received, being screamed at and belittled on a daily basis, being forced to work late, being written up when others were not for the same conduct and being the recipient of racial slurs." (Docket Entry No. 1, Complaint at ¶ 7). Plaintiff further alleges that she was subjected to retaliation after she complained about the racial harassment.

1

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 15), contending, in sum, that (1) Plaintiff's race discrimination claim fails because she cannot establish that Defendants are the unusual employers who discriminate against the majority; (2) that the alleged harassment was based upon her race; (3) that she was subject to severe or pervasive harassment; (4) or that there should be employer liability; (5) Plaintiff's retaliation claim fails because she cannot establish that she engaged in a "protected activity" or that there was a materially adverse action; and (6) there was no constructive discharge.

Plaintiff responds that she has established a prima facie showing of hostile work environment based upon reverse discrimination and has "created a genuine issue of material fact upon this issue." (Docket Entry No. 23, at 12, 13). Plaintiff further argues that she has made a prima facie showing of retaliation based upon her supervisor's conduct becoming even more hostile and ignoring her in crisis situations cumulating in her being attacked by residents. (Docket Entry No. 23, at 20-22). Plaintiff also argues that a genuine issue of material fact exist on the issue of constructive discharge rendering summary judgment inappropriate. (Docket Entry No. 30, at 4).

For the reasons set forth below, the Court concludes that Plaintiff has not presented sufficient proof to support a judgment or her claim of racial discrimination, retaliation or hostile work environment. Accordingly, the Court concludes that Defendants' motion for summary judgment should be granted on all claims.

2

## A. Findings of Fact[1]

Plaintiff, a Caucasian female, began working for CHAD in October 2006 as a Mental Health Associate ("MHA") on the second shift. (Docket Entry No. 27, Statement of Undisputed Facts, at ¶ 1). At her request, Plaintiff transferred to the first shift in December 2006. Id. On the first shift, Plaintiff and another MHA cared for the female residents. (Docket Entry No. 19, Attachment 2, Plaintiff's Deposition, at 48). During Plaintiff's employment at CHAD, the members of management were Caucasian, African American, and Hispanic. (Docket Entry No. 19, Attachment 2, Torres Deposition, at 42-44; Docket Entry No. 27, Statement of Undisputed Facts, at ¶ 3). The majority of CHAD's workforce was African American.

When she was hired, Plaintiff was initially supervised by Earnest Peeler, an African American male. Peeler evaluated Plaintiff and found her to be a good employee. After Peeler left the company, Yvonne Wiley, an African American female, became the shift supervisor and Plaintiff's first line supervisor.[2] Sam Torres, a Hispanic male, was the unit manager and Wiley's

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Upon review of the parties' submissions and the applicable law, the Court concludes that there are not any material factual disputes. Thus, this section constitutes a finding of fact under Fed. R. Civ. P. 56(d).

[2] The parties dispute whether Wiley qualifies as a "supervisor" for purposes of employer liability. Plaintiff argues that Wiley was a supervisor because she became shift supervisor. Defendant argues that Wiley was merely a co-worker because she did not have "independent authority to make significant personnel decision, i.e. hire, fire or promote/demote individuals. Rather these were the duties of Torres, as the Unit Manager." (Docket Entry No. 28, at 6). The Court concludes that this dispute is not material as by Torres' own assertion, he was responsible for scheduling of MHAs and shift supervisors. (Docket Entry No. 23, Attachment 6,

3

supervisor during the relevant time period.

Plaintiff alleges that she was harassed on a daily basis by Wiley and Virginia Alim. (Docket Entry No. 27, Statement of Undisputed Facts, at ¶ 2 ). Wiley refused to assist Plaintiff, screamed at Plaintiff over the radio, assigned her the hardest or roughest female residents, made comments about Plaintiff smelling bad and wearing bad perfume, used a hostile tone when speaking to Plaintiff, refused to relieve Plaintiff for breaks, required Plaintiff to stay late when she had a final examination, refused to permit Plaintiff to call her husband when she was required to work late, demeaned Plaintiff in front of the residents, and called her "baby doll" or "Barbie doll." (Docket Entry No. 19, Attachment 2, Plaintiff's deposition, at 74-75, 85). Alim, an African American female MHA, told Plaintiff what to do, tattled to Wiley, corrected Plaintiff in front of the residents, and giggled and rolled her eyes at Plaintiff. Id. at 83-84. Wiley or Alim did not make negative race-based comments about Caucasian people. Id. at 96.

As to the allegation regarding resident assignments, Plaintiff acknowledged that all the residents were tough kids and the other MHAs on her shift also had difficult residents in their care.

> Q. . . . So when you say that you were given the hardest or roughest girls, are you saying Miss Phillips' girls were all sweet, sugar and spice?
>
> A. No.
>
> Q. No issues, no problems?
>
> A. No.
>
> Q. Okay. All the kids are tough kids, aren't they?

Torres Affidavit, at ¶ 2). Torres also handled the hiring for CHAD. (Docket Entry No. 19, Attachment 2, Plaintiff's deposition, at 174-177).

4

A. Yes.

Q. Do you know who, according to company protocol, is supposed to be making the assignments?

A. What assignments?

Q. As to which [MHA] was going to be assigned to . . . which group of girls?

A. No.

Q. Okay.

A. Miss Wiley always did it.

Q. Do you have any evidence to disprove that it is – was technically Mr. Torres' job?

A. No. I don't know.

(Docket Entry No. 19, Attachment 2, Plaintiff's deposition, at 100-101). Torres, the unit manager, described his job duties as including scheduling for MHAs and shift supervisors, coordinating services and transportation of residents, disciplining shift supervisors, and ensuring appropriate discipline for MHAs. (Docket Entry No. 23, Attachment 6, Torres Affidavit, at ¶ 2).

Plaintiff testified that she did not know whether Wiley's disliked her because she was new and inexperienced or because Plaintiff was Caucasian. Id. at 93. Plaintiff stated that it was the same with Alim. Id. Plaintiff attributed this conduct to her race because she observed Wiley treat Caucasian and African American employees differently. Id. at 86, 94. Plaintiff explained that Wiley and Alim "made it so obvious as a racial – on a daily basis, when white people are talked to and belittled and didn't get fair treatment as to them, it was just obvious." Id. at 93-94. Plaintiff testified that she suffered from panic attacks as a result of Wiley and Alim's conduct, but acknowledged that she had previously suffered from panic attacks and taken medicine to

5

control her anxiety.  Id. at 94.

In December 2006, Plaintiff complained to Charville Smith, an African American female and manager from human resources, about the way Wiley spoke to her.  Id. at 140.  Plaintiff did not at that time report that Wiley was harassing her or that Wiley's conduct was based on race.  (Docket Entry No. 27, Statement of Undisputed Facts, at ¶ 4).  Smith met with Wiley, informed her that there were complaints, and instructed Wiley to be mindful regarding the way she communicated with others.  Id.

In January or February 2007, Plaintiff met with Smith and Mike Owens, a Caucasian male and director of human resources, to report that Wiley's conduct had not improved.  Specifically, Plaintiff complained about how Wiley "talked to [her] over the radio, talked to me in front of the children and other employees and my coworkers.  The hostile tone and demeanor that she had with me."  (Docket Entry No. 19, Attachment 2, Plaintiff's Deposition, at  142).  Wiley came to the meeting and after Plaintiff "explained to her what my problems were. [Wiley] became defensive and walked out of the room laughing."  Id. at 142.

Plaintiff again met with Smith in March 2007 about Wiley's conduct.  Smith provided a compliance hotline number to Plaintiff and also advised her to meet with Dr. Duwayne Glasner, a Caucasian male and CHAD's chief executive officer.  (Docket Entry No. 27, Statement of Undisputed Facts, at ¶¶ 3, 6).  Plaintiff met with Dr. Glasner and states that he did nothing to rectify the situation.   Glasner submitted his declaration about his meeting stating: "The gist of [Plaintiff's] complaint was that [Wiley] was rude to her. [Wiley] was known to have a very direct and loud personality.  She could rub people the wrong way.  I responded to [Plaintiff's] complaint by talking with [Wiley]. . . The situation was clearly a personality conflict between a

6

long term, experienced employee and a new, inexperienced employee trying to learn the job. I told [Wiley] to be more polite when communicating with [Plaintiff]. I then told [Plaintiff] to come see me if she had any further issues. She did not do so." (Docket Entry No. 18, Glasner Declaration, at ¶ 3).

In March or April 2007, Plaintiff met with Smith and Owens regarding Wiley's conduct. At this meeting, Plaintiff told them she "felt that it was racially motivated, the way that I was being treated by Miss Wiley, and I believe at that time they called Mr. Torres in . . . And I repeated what I told them to Mr. Torres." (Docket Entry No. 24, Plaintiff's Deposition, at 152). Wiley was summoned to the meeting, but became aggressive and departed the meeting when informed that Plaintiff believed the conduct was racially motivated. Id. at 151; Docket Entry No. 23, Attachment 6, Torres Affidavit, at ¶ 8. As a result of Plaintiff's complaint, Torres began carrying a radio to monitor Wiley's communications. (Docket Entry No. 27, Statement of Undisputed Facts, at ¶ 27).

Defendant disputes that Plaintiff informed human resources that Wiley's conduct was racially motivated. However, Smith's testimony undermines this assertion. Smith testified that Plaintiff complained Wiley was treating Plaintiff differently than her friends, specifically Alim, and Smith further acknowledged that Wiley's friends were African American. (Docket Entry No. 19, Attachment 4, Smith deposition, at 14, 16-19). Smith explained that this did not meet her personal definition of racial harassment, but CHAD's definition of race harassment included "[w]hen you treat someone different based upon their race." Id. at 18. Moreover, Torres recalled

7

the meeting and the Plaintiff's allegation that Wiley's conduct was racial.[3] (Docket Entry No. 23, Attachment 6, Torres Affidavit, at ¶ 8).

In or around April or May 2007, Plaintiff also complained about Alim's conduct. Management requested thirty days to address the problem and elected to change Alim's schedule from first to second shift so that Alim would no longer work with Plaintiff. (Docket Entry No. 19, Attachment 3, Torres deposition, at 194-195; Docket Entry No. 19, Attachment 4, Smith deposition, at 37-38; Docket Entry No. 18, Glasner declaration, ¶ 4). Plaintiff was advised that Alim would be removed from the first shift. (Docket Entry No. 19, Attachment 2, Plaintiff's deposition, at 179).

After Plaintiff's first complaint, Wiley yelled at her more over the radio, ignored her requests for help in "crisis situations" on at least three to four occasions beginning in February or March 2007, and told another employee that "people" were "going to HR on me, spreading lies." Id. at 167-171. On May 8, 2007, Plaintiff was physically attacked by female residents in her custody. At the time, Plaintiff was supervising sixteen residents. Plaintiff asked another resident to get a nurse and the nurse responded to assist. Id. at 173. Plaintiff acknowledged that Wiley, who was then in a meeting with Torres, did not cause the attack. Id. at 172-174. Plaintiff alleges that Wiley set the stage for the attack by failing to act to reduce the number of residents in Plaintiff's care when she knew they were short staffed. Id. at 174-75. Plaintiff also acknowledged that Torres, in connection with human resources, handled hiring for CHAD and

_____

[3]    The Court construes all factual contentions in the light most favorable to Plaintiff as the nonmoving party. Duchon, 791 F.2d.at 46. For purposes of the summary judgment motion, the Court concludes that Plaintiff informed human resources in substance that she believed that Wiley's conduct was based upon race, even if she did not use the words "racial harassment."

that Torres was Wiley's supervisor. Id. at 174-177.

On May 29, 2007, Plaintiff arrived for work, observed that Alim was present at the first shift, and quit her job. Plaintiff confirmed that the reason she quit was "because [she] showed up on or about May 29th thinking that Miss Virginia Alim was no longer working on the first shift, and [she] walked into the building, and [she] saw her there, and [she] assumed that the company was not going to do anything about [her] allegations." Id. at 181-182.

Kim Masters,[4] a Caucasian female MHA employed from November 2006 to November 2007, submitted an affidavit stating that CHAD "was an extremely hostile work environment if you were a white employee." (Docket Entry No. 23, Attachment 3, Masters Affidavit, at ¶¶ 1, 9). Specifically, Masters stated that Caucasian employees were given more difficult assignments, left alone to handle children, belittled, treated differently, and not provided assistance from African American employees. Id. at ¶ 4.

Harold Ginter, a Caucasian employee employed at CHAD from November 2004 to August 2007, submitted an affidavit stating that he "witnessed discrimination of white employees, including myself, by management." (Docket Entry No. 23, Attachment 4, Ginter

---

[4] Defendants objects to the affidavits of Masters', Wallace, and Ginter due to Plaintiff's alleged failure to disclose these witnesses, and objects to these affidavits and Holbert's affidavits as conclusory. Plaintiff responds that Ginter and Masters were disclosed in a companion case with the same counsel, Plaintiff mentioned Masters in her deposition, Torres mentioned Ginter in his deposition, and all three individuals fall into the disclosed category of "past and present employees of Defendant working at the facility at issue." Plaintiff further responds that "Ginter, Masters, and Wallace had no direct knowledge of Nicole Ford or how she was treated. Their knowledge consist of verifying theat the environment . . . was hostile to white employees. . . [.]" (Docket Entry No. 36, at 7). The Court concludes that the affidavits of Masters, Ginter and Holbert are appropriate and, accordingly, overrules Defendants' objections to such filings. However, the Court concludes that Wallace's affidavit should be stricken and will not be considered in connection with the summary judgment motion.

9

Affidavit, at ¶ 2). Specifically, he was constantly reprimanded by Wiley and Alim in front of residents, refused assistance, and "witnessed a black employee use a racial slur towards a white employee and nothing was ever done about it . I watched . . . Nicole Ford and Christina Holbert, be harassed, and be disrespected on a daily continuous basis. They were made to stay over their shift on a frequent basis and were constantly belittled." Id. at ¶¶ 6, 7.

Christina Holbert, a Caucasian female MHA employed at CHAD from December 2006 to approximately June 2007, submitted an affidavit stating that she was given the most difficult assignments, left alone to handle children, did not receiving assistance, and was belittled. (Docket Entry No. 23, Attachment 5, Holbert Affidavit, at ¶¶ 2, 5). When Holbert submitted her notice of resignation, she informed management that she believed these problems were racial in nature. Id. at ¶ 7.

Sam Torres submitted an affidavit stating that: "For approximately one year prior to my leaving Chad, a group of black employees targeted white employees at Chad and tried to and did force these employees to leave their jobs. This resulted in a hostile work environment for white employees . . . These employees were protected by John McDuffie, a black male who was the second in command at Chad. Even though I was their first or second level supervisors, I had absolutely no control over these individuals [because his supervisor, McDuffie, backed their every action]. . . [.]" (Docket Entry No. 23, Attachment 6, Torres Affidavit, at ¶ 4).[5] Torres

_____

[5] The Court notes that in the companion case of Torres v. Chad Youth Enhancement Center, Judge Campbell held that plaintiff failed to establish a prima facie showing of reverse discrimination because there was no constructive discharge or other adverse employment action. 2009 WL 2850709, * 3. The court further held that Torres failed to establish his retaliation and hostile work environment claims and granted defendants' motion for summary judgment. Id. at *3-4.

10

was aware of other employees quitting due to complaints of racial harassment.

## B. Conclusions of Law

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme

Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court

defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of the

need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v.</u>

<u>McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). But <u>see</u> <u>Routman v. Automatic Data</u>

<u>Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required

11

showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

12

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> \*       \*       \*
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it. upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.
>
> It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791

13

F.2d. 43, 46 (6th Cir. 1986) (citation omitted).

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.     Complex cases are not necessarily inappropriate for summary judgment.

2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.     The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment.  The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.     As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

14

10.     The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence.  The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

### 1.     Reverse Race Discrimination Claim

Plaintiff relies on indirect evidence to establish her prima facie showing of Title VII reverse race discrimination.  As such, Plaintiff must produce proof of the following: (1) "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority," (2) that Plaintiff was qualified for the job; (3) that Plaintiff suffered an adverse employment action; and (4) that similarly situated employees of a different race were treated differently.  Goller v. Ohio Dept. of Rehab. & Corr., No. 285 Fed.Appx. 250, 255 (6th Cir. July 18, 2008) (citations omitted).

The Court begins its analysis with the third factor, adverse employment action, as it is dispositive in this action.  Plaintiff attempts to establish an adverse employment action by

15

demonstrating that the working conditions at CHAD were so hostile that she was forced to resign as a result of constructive discharge. "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) 'the **employer** . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person' and 2) the **employer** did so 'with the intention of forcing the employee to quit . . . [.]'" Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001) (emphasis added and citations omitted). "Factors to consider in determining whether a reasonable person would have felt compelled to resign include whether the actions of the employer involved (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment or humiliation by Defendant calculated to encourage Plaintiff's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." Torres v. Chad Youth Enhancement Center, No. 3:08-CV-0636, 2009 WL 2850709, *2 (M.D.Tenn. Sept. 1, 2009) (citing Logan, 259 F.3d at 569). Plaintiff does not argue or submit proof that she was subject to demotion, reduction in salary or job responsibilities, reassignment, or offered early retirement.

Here, Plaintiff contends that she experienced harassment calculated to encourage her resignation. Plaintiff presented testimony that Wiley was rude to her, belittled her in front of the residents, yelled at her on the radio, did not provide assistance, assigned the roughest residents,[6] and that Alim tattled on her, rolled her eyes, and corrected Plaintiff. However, Plaintiff has not presented any proof to establish that such conduct was calculated by Defendants to encourage

_____

[6] Plaintiff does not contend, however, that she was reassigned to menial or degrading work or to a younger supervisor. Moreover, according to the evidence presented, Torres was the individual tasked with scheduling for MHAs and shift supervisors, not Wiley.

16

Plaintiff to resign. Aside from whatever motivated Wiley, the evidence demonstrates that CHAD's management attempted to rectify Plaintiff's concerns about Wiley's conduct by holding several meetings with Wiley, admonishing Wiley to improve her demeanor, and by carrying a radio to monitor Wiley's communications. CHAD's management also attempted to rectify Plaintiff's concerns about Alim's conduct by switching Alim to the second shift so that she would no longer work with Plaintiff.

Considering the factors outlined above and the evidence in the light most favorable to Plaintiff, the evidence does not establish that Defendants deliberately created working conditions that were intolerable to a reasonable person or that Defendants intended to force Plaintiff to resign. Thus, Plaintiff has not established that she was subject to a constructive discharge and Plaintiff did not suffer an adverse employment action necessary for her reverse race discrimination claim under Title VII.

The Court further notes that Plaintiff has failed to establish the first element of the prima facie showing of background circumstances. Plaintiff alleges that she has satisfied the background circumstances element because "the workforce at Chad was predominately black, the supervisors at issue were black, [and] Plaintiff was white," (Docket Entry No. 23, at 13) (citing Zambetti v. Cuyahoga Comty. College, 314 F.3d 249 (6th Cir. 2002). Defendants respond that Plaintiff's reliance on Zambetti is misplaced because the relevant decision makers were not all African American. (Docket Entry No. 28, at 2-3).

In Zambetti, the plaintiff, a Caucasian, alleged that defendants promoted three less qualified African American candidates. 314 F.3d at 252. The Sixth Circuit held that the plaintiff created a genuine issue of material fact on "background circumstances" based upon the fact that

17

"the person in charge of hiring for CCC, Chief Harris, was himself African-American." Id. at

257. See also Turner v. Grande Pointe Healthcare Cmty., 631 F.Supp.2d 896, 911 (N.D.Ohio

2007) (Applying Zambetti, holding that "the fact that the majority of the workforce and

management at Grande Pointe, as well as all of the decision makers in the instant claim, are

female does 'support the suspicion that the defendant is that unusual employer who discriminates

against the majority'"). This action is factually distinguishable from Zambetti and Turner because

here a Hispanic male was in charge of hiring and shift assignments and there were both Caucasian

and African American members of management who were decision makers, including Glasner,

CHAD's chief executive officer who is causation. Thus, Plaintiff has failed to establish that

Defendants are the unusual employers who discriminate against the majority.

For these reasons, Plaintiff does not present evidence sufficient to establish a prima facie

showing of reverse race discrimination and Defendants' motion for summary judgment should be

granted on this claim.

### 2.    Retaliation Claim

"To establish a claim for retaliation in violation of Title VII, Plaintiff must show . . . . (1)

he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to

the Defendant; (3) Defendant thereafter took adverse employment action against the Plaintiff, or

the Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4)

there was a causal connection between the protected activity and the adverse employment action

or harassment." Torres, 2009 WL 2850709 at * 3 (citations omitted). Severe or pervasive

harassment is that which is "extreme to amount to a change in the terms and conditions of

employment," and does not include "simple teasing, offhand comments, and isolated incidents

18

(unless extremely serious)." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citations omitted).

If a plaintiff establishes a prima facie showing, the employer must articulate a legitimate, nondiscriminatory reason for its actions, and the plaintiff must then demonstrate that the proffered reason was pretextual. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 793 (6th Cir. 2000)(citation omitted). "The employer may also prove an affirmative defense by a supervisor by demonstrating: '(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.'" Id. (citation omitted).

Here, Plaintiff contends that Wiley retaliated against her for complaining to Human Resources by being "even more hostile immediately thereafter" and "ignoring Plaintiff in crisis situations." (Docket Entry No. 23, at 22; Plaintiff's deposition, at 167-68). Plaintiff has satisfied the first two elements of the prima facie showing with proof that she made a complaint of racial harassment that was known to Defendants. The Court has already found that Plaintiff did not suffer an adverse employment action. Thus, to satisfy the third and fourth elements, Plaintiff must present evidence that she was subjected to severe or pervasive retaliatory harassment and that there was a causal connection between Plaintiff's complaint and Wiley's harassment.

Accepting as true the facts asserted by Plaintiff, Wiley began to yell at her more on the radio, began to ignore her in crisis situations on three to four occasions, and told another employee that "people" were spreading lies to Human Resources. After Plaintiff attributed Wiley's conduct to race in April 2007, Plaintiff was physically attacked by female residents in her

19

custody. Wiley did not cause the attack, but allegedly should have done something to reduce the number of residents in her care. However, Torres, as unit manager, was Wiley's supervisor and ultimately in charge of hiring and shift assignments for MHAs. The Court concludes that no reasonable juror could conclude that Wiley's conduct constituted severe or pervasive retaliatory harassment by the Defendants. This conduct is more akin to comments and isolated incidents that "Faragher indicated did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment." Morris, 201 F.3d at 793. As discussed below, Title VII does not extend to offensive conduct nor establish a code of civility for co-employees.

Therefore, the Court concludes that Plaintiff does not present evidence sufficient to establish a prima facie showing of retaliation and Defendants' motion for summary judgment should be granted on this claim.

### 3. Hostile Work Environment

To the extent that Plaintiff attempts to assert a hostile work environment claim based upon reverse race discrimination, "Plaintiff must prove (1) 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority'"; (2) that she was subjected to unwanted racial harassment, (3) that the harassment was based upon race, and (4) "that the harassment 'had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment . . . [.]'" Arendale v. City of Memphis, 519 F.3d 587, 604-05 (6th Cir. 2008) (citations omitted). The Plaintiff must also prove that the employer is liable for such harassment. Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009).

As to the fourth element, a court must determine if the harassment is "severe or

20

pervasive," considering the totality of the circumstances in light of the following factors: " the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with

an employee's work performance." Kelly v. Senior Ctr., Inc., 169 Fed.Appx. 423, 428 (6th Cir.

2006) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999)).

As to employer liability, the relevant legal standard depends on whether the harasser was a

supervisor or employee.    Barrett, 556 F.3d at 515.

> Employer liability for co-worker harassment stems directly from the employer's
> actions, or lack thereof, in response to the harassment: The plaintiff must show that
> the employer "'knew or should have known of the charged [racial] harassment and
> failed to implement prompt and appropriate corrective action.' " Hafford, 183 F.3d
> at 513 (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 n. 11 (6th
> Cir. 1994)). In contrast, employers are vicariously liable for harassment by
> supervisors, and the employee need not show that the employer had knowledge of
> the harassment. Id.

Id. at 516. As with retaliatory harassment, an employer can raise an affirmative defense to

liability for supervisor harassment. Id.

On this claim, Plaintiff contends she has satisfied the first element because "the

supervisors at issue were black" and there was widespread disparate treatment of Caucasian

employees. (Docket Entry No. 23, at 14). Plaintiff contends she has satisfied the second element

because Wiley and Alim's conduct was "a pattern of conduct displayed by a small group of black

employees towards only white employees" that was sufficiently severe and that "others not

involved in the matter could see such conduct and see the effects it had on Plaintiff." Id. at 15.

Plaintiff contends she satisfied the third element because "there is no evidence that anything other

than race was the reason for this action." Id. at 16. Plaintiff argues she has established the fourth

21

element because Wiley's actions were "frequent, severe, threatened Plaintiff's physical well being on a daily basis and interfered with her ability to work." Id. at 17. Plaintiff contends she has established employer liability because "what little action was taken [by CHAD's management] was totally ineffective and served to make matters even worse," id. at 18, and John McDuffie, an African American male and second highest member of management, was aware of Wiley's conduct, but did not do anything to stop it. Id. at 19.

Here, the Court has already concluded that Plaintiff did not establish the first element of background circumstances. Even if Plaintiff could establish the second element of unwanted harassment, Plaintiff has not produced sufficient evidence to establish that any such harassment was based upon her race. Plaintiff argues that "the harassment at issue was conducted by a small group of black employees on white employees. All involved in this harassment were black. The only one's being harassed were white. There is no evidence that anything other than race was the reason for this action. . . The only problems Plaintiff had were those generated by this group of black employees and it was a problem shared by other white employees." (Docket Entry No. 23, at 14-15).

Plaintiff primarily relies on her own testimony and perception to establish harassment based upon her race. To be sure, Plaintiff also submitted the affidavits of Torres, Holbert, Ginter, and Masters as proof that there was a hostile environment for Caucasian people. Yet, Plaintiff acknowledges that "Ginter and Masters had no direct knowledge of Nicole Ford or how she was treated." (Docket Entry No. 36, at 7). Plaintiff testified neither Wiley nor Alim made any negative race-based comments about Caucasian people. Moreover, Plaintiff testified that she did not know whether Wiley or Alim disliked her because she was new and inexperienced or because

22

of her race. Plaintiff attributed Wiley and Alim's conduct to her race because it was "obvious" that "white people are talked to and belittled and didn't get fair treatment" on a daily basis. Such conclusory assertions cannot withstand a motion for summary judgment. Arendale, 519 F.3d at 605 (rejecting hostile environment claim when "Plaintiff's allegations of racially motivated harassment rest entirely on several statements which are either conclusory or raise no inference of racial animus" and were based on plaintiff's testimony stating personal opinion he was the victim of racial harassment.) Under Arendale, the proof submitted by Plaintiff is conclusory and is insufficient to support a judgment. Thus, Plaintiff has failed to present proof to establish the third element of the prima facie showing.

For these reasons, the Court concludes that Plaintiff has not presented evidence sufficient to establish a prima facie showing of hostile work environment and Defendants' motion for summary judgment should be granted on this claim. In light of this holding, the Court need not address the disputed issue of employer liability and whether Wiley qualifies as a supervisor for Title VII purposes.

### C. Conclusion

For the reasons stated herein, the Defendants' motion for summary judgment (Docket Entry No. 15) should be granted in its entirety.

An appropriate Order is filed herewith.

Entered on this the ___24th___ day of March, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

23